IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| TERRA WARGO, | ) |
| PLAINTIFF, | ) ) ) Civil Action No.: ) ) HON. ) ) ) ) ) ) |
| VS. | |
| MJR PARTRIDGE CREEK DIGITAL CINEMA 14 | |
| DEFENDANT. | |

## COMPLAINT

PLAINTIFF, Terra Wargo, by and through her attorneys, CARLA D. AIKENS, P.L.C., submits the following Complaint against DEFENDANT MJR Partridge Creek Digital Cinema 14.

## JURY DEMAND

COMES NOW PLAINTIFF, Terra Wargo, and hereby makes her demand for trial by jury.

## JURISDICTION

1. Plaintiff Terra Wargo was a resident of Macomb County in the State of Michigan at all times relevant to this action.

2. Defendant is a domestic limited liability company, with a continuous and systematic place of business located at 17400 Hall Rd., Clinton Township, Michigan 48038.

3. All relevant actions giving rise to this complaint took place in Macomb County in the State of Michigan.

1

4. This action is brought in this Court on the basis of federal question jurisdiction, pursuant to Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq.

5. Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over Plaintiff's state law claims.

**VENUE**

6. Venue is proper in the Eastern District of Michigan pursuant to Section 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment discrimination giving rise to Plaintiff's claims occurred in this District.

**STATEMENT OF FACTS**

7. Plaintiff Terra Wargo was at all times pertinent to this Complaint am employee of Defendant.

8. On April 2, 2021, Paul Finnigan transferred from MJR Chesterfield Digital Cinema 20 to MJR Partridge Creek Digital Cinema 14, to replace General Manager, Matthew Swartz.

9. Upon information and belief, Finnigan had previous complaints of sexual harassment against him that were known throughout Defendant's company.

10. Upon his hire, staff and management were immediately met with a lack of respect and almost complete silence from Finnigan.

11. Members of the staff, including Plaintiff, voiced their concerns to management about Finnigan.

12. On April 6, 2021, Matthew Swartz spoke with Joel Kincaid, the Vice President of Operations, regarding management and staff's concerns regarding Finnigan's lack of communication.

13. On April 12, 2021, Paul invited Plaintiff to Bar Louie, located within Partridge Creek, via text message.

14. Plaintiff declined Finnigan's invitation to Bar Louie.

15. A few hours later, Finnigan texted her about work claiming, "he would teach her everything he knows if she would let him", along with other messages.

16. On 5/24/21, Finnigan texted Plaintiff while they were working together and asked if she wanted to get something to eat, Plaintiff declined again.

17. After being denied, Finnigan proceeded to text Plaintiff multiple times later in the same shift, inquiring about her personal life.

18. Finnigan thanked Plaintiff for painting one of the offices and said he wanted to treat her to dinner. Once Plaintiff mentioned the other female managers who helped paint, Hannah Vennard and Amanda Zonca, Finnigan did not reply.

19. On June 17, 2021, Finnigan saw Plaintiff driving past MJR Partridge Creek. He was going in the opposite direction, but the two made eye contact.

20. Plaintiff proceeded to drive over to Bar Louie, where she was meeting a friend. Once she parked her car, she noticed that Finnigan had turned around and followed her.

21. Plaintiff watched Finnigan drive past and search the parking lot for her. Plaintiff moved her car in between two cars because she feared what would happen if he saw her. Finnigan then texted Plaintiff stating that he saw her, to which she did not respond.

22. On June 21, 2021, Finnigan invited Vennard to the bar when she got off her shift to discuss work. She found that Finnigan was visibly intoxicated.

23. Vennard told him that Plaintiff did not like him and discussed some of the issues they had with him.

24. Finnigan disclosed that he knew Plaintiff and Vennard were going to talk to Joel Kincaid and that it did not matter because he would believe him over the two women.

25. On July 8, 2021, Plaintiff spoke with Josh Jensen, the Department Manager, via Zoom. Plaintiff explained to him some of the issues she was having with Finnigan regarding her completing her job.

26. On July 12, 2021, Plaintiff and Finnigan were on the same shift when Finnigan inquired whether Plaintiff was doing anything after work.

27. She explained that she was getting picked up by her mother and they were going to obtain a rental car.

28. Finnigan told Plaintiff that they needed to talk and jokingly invited her mother to come to the bar with them, which Plaintiff declined.

29. Finnigan continued on, saying that he would return to Partridge Creek the following day around 10 p.m. while Plaintiff was working, and that they could go to the bar to talk then.

30. Plaintiff was uncomfortable with this and did not want to go but agreed for the sake of not being considered insubordinate.

31. On July 13, 2021, Finnigan texted Plaintiff and Hannah Vennard. He insinuated that Joel Kincaid had talked with him about getting his building under control. Finnigan was upset and "blindsided" by this, claiming everything was going well.

4

32.     Plaintiff responded and told Finnigan that he did not listen nor care about the staff's opinions.

33.     Close to 10 p.m., Finnigan texted Plaintiff and stated that he was at Bar Louie. Plaintiff responded and said that it was busy at work and that she was not leaving.

34.     After following Plaintiff around the building for approximately an hour while she was closing the venue, Finnigan texted her and told her to come meet him next door within 5 minutes.

35.     Plaintiff did not see this text message until after Finnigan had come to confront Plaintiff in person, demanding she go next door to his office immediately.

36.     Finnigan's tone was aggressive, and Plaintiff was afraid to go into his office with him.

37.     However, once again, fearing being considered insubordinate, Plaintiff went with Finnigan. He asked her what problem she had with him, so she proceeded to discuss some of the issues regarding her job.

38.     Finnigan raised his voice at Plaintiff and slammed a paper on the table in front of her, to prove that he did far more work than she believed.

39.     Plaintiff told him that she was not going to be talked to that way and got up to go next door to the manager's office.

40.     Finnigan immediately followed Plaintiff and, once he entered in the office after her, he blocked the door with his body.

41.     Plaintiff attempted to leave, verbally expressed that she wanted to leave, but Finnigan put his hand on her arm when she tried to exit.

5

42. Terrified, Plaintiff immediately told him to never put his hands on her and backed away, while proceeding to verbally ask him to move out of her way.

43. While the two continued to go back and forth verbally, Plaintiff kept her distance in the middle of the office for safety.

44. Plaintiff was finally able to leave by forcing the door into Finnigan's back, since he would not move out of her way to allow her to exit.

45. After Plaintiff left the building, she was found in her car crying by the assistant manager, Amanda Zonca, who had come out to check on her.

46. Plaintiff briefly told Zonca what happened, and Zonca then went back inside while Plaintiff left the premises.

47. Plaintiff called her two of her co-workers to tell them what happened.

48. On July 14, 2021, Plaintiff messaged Joel Kincaid to discuss the events of the night prior with Finnigan.

49. Vennard then helped Plaintiff with a document containing all of the issues they had with Finnigan, to present to Kincaid together.

50. Plaintiff asked if Kincaid would be available sometime the following day for her and Vennard to talk to him.

51. Kincaid, however, declined the meeting with the two women and instead insisted on talking to Plaintiff 1-on-1 the following day, around 3 p.m.

52. On July 15, 2021, Plaintiff met with Joel and Melissa Hattle, Human Resources Manager. Plaintiff began discussing the notes that Vennard had made for the conversation with Kincaid.

53. After addressing several issues, Plaintiff was questioned by Kincaid about her attempts to "give Finnigan a chance." She told him that she was excited to work with Finnigan until they were all met with disrespect and silence.

54. Plaintiff mentioned the uncomfortable text messages, such as him inviting her to dinner, and told him that she would read them or provide them if needed, but Plaintiff was told that it would not be necessary.

55. At the end of the meeting, Plaintiff told them about what happened two nights prior and was in tears reliving the moment.

56. Hattle asked Plaintiff when she was scheduled to work with Finnigan again and if Plaintiff would be comfortable working with him.

57. Kincaid asked Plaintiff who knew about this incident and told her to tell the truth because he would find out regardless. Plaintiff told him that Kyle Roney and Amanda Zonca were there when it happened, and that she told Vennard after and watched the cameras with another co-worker.

58. Plaintiff informed Kincaid and Hattle that she was not comfortable working with him but for the sake of being less complicated she agreed to do so, under the impression that it was only one shift, the upcoming Monday.

59. On July 19, 2021, as requested, Plaintiff emailed Hattle and Kincaid to send them the notes she shared in person and address a few other issues.

60. In the email, Plaintiff also shared the situation where Finnigan followed her.

61. Plaintiff ended the email stating she would be happy to provide any of the text messages to support the instances discussed.

62. Hattle responded shortly after Plaintiff's email and told her that any serious allegations needed to be reported using a form that was attached.

63. On July 22, 2021, Plaintiff replied to Hattle's email and asked a question regarding how to fill out the form, to which she received no response.

64. On August 2, 2021, Plaintiff filled out the form in detail and emailed it to Hattle.

65. On August 3, 2021, Hattle responded and told Plaintiff that she and Kincaid would follow up shortly after payroll.

66. On August 9, 2021, Kincaid showed up to MJR Partridge Creek unannounced, requesting to talk to Plaintiff on her way out of work. Plaintiff explained that she was going up north and did not have time to talk, since she was no longer on the clock. Kincaid asked Plaintiff when she was scheduled to return and said he would see her then.

67. On August 16, 2021, Plaintiff returned from her time off. She was expecting a visit from Kincaid and Hattle.

68. Plaintiff emailed Hattle, stating that she would not be comfortable speaking in a room with Finnigan present. She mentioned that she did not think this would go on for a month and it should have not been her decision to make to continue working with him.

69. Plaintiff said that she believed the way things had been handled has put her safety at risk.

70. Hattled replied to Plaintiff's email two days later, stating that she and Kincaid would be out around 3 p.m. to speak to her on Thursday, August 19, 2021.

71. On August 19, 2021, Kincaid and Hattle came to tell Plaintiff the findings of the investigation, and Plaintiff was offered a transfer to MJR Marketplace Digital Cinema 20.

72. Hattle initiated the conversation by assuring that she and Kincaid had been investigating the situation thoroughly, but then later claimed that Kincaid had nothing to do with the investigation and that the findings were solely based on her own investigation.

73. Kincaid chimed in to say that he was going to do whatever Hattle had suggested after her investigation.

74. Kincaid was involved in the entirety of the investigation, talking with Plaintiff, Finnigan, and Vennard.

75. Plaintiff was told that no harassment of any sort happened and nothing illegal happened by either party.

76. Hattle told Plaintiff that she was insubordinate and that misconduct was discovered between both parties.

77. Hattle also told Plaintiff that she was never allowed to deny Finnigan a conversation, or to walk out of a conversation with him. She went on to say that if her boss, Kincaid, were to ask her to speak then she would need to do so immediately.

78. Whenever Plaintiff brought up the video evidence of Finnigan's aggression, him putting his hand on her and blocking the exit, she was told that due to the video not having audio, they could not tell what happened.

79. Hattle implied that things would be different if Finnigan had physically harmed Plaintiff.

80. Hattle told Plaintiff that many employees appreciate going out with their boss and value that in the workplace, so they could not do anything about the advances from Finnigan.

9

81. Hattle also dismissed incidents involving Finnigan, stating that people can raise their voices for many reasons, such as being excited.

82. Further, Hattle claimed that Plaintiff was scheduled until 12 a.m. so technically she could be fired for leaving early that night, when Plaintiff actually left the office shortly after midnight.

83. Kincaid did not speak much during this conversation besides raising his voice exclaiming "Paul is not going to be fired, that's not going to happen" and that "If you talked to me the way you talked to Paul, I would have fired you on the spot."

84. Given that Hattle was supervised by Kincaid, and Kincaid and Finnigan had a close relationship, it was clear to Plaintiff that the matter was not going to be fairly investigated.

85. On August 22, 2021, Plaintiff met with Hattle over Zoom around 7:30 p.m. to accept her transfer offer, since she needed a job and did not have any other alternative.

86. Hattle then told Plaintiff that she believed the transfer would provide a lot of opportunities for Plaintiff, more than she would have at Partridge Creek.

87. Plaintiff's transfer was to be effective immediately, with just a few hours' notice for her last shift at Partridge Creek.

88. Hattle did not have much information on Plaintiff's schedule for the rest of the week or what job she would be doing at Marketplace.

89. On August 27, 2021, Plaintiff began working at MJR Marketplace Digital Cinema 20.

90. On September 20, 2021, Hattle sent Plaintiff documents regarding the investigation summary, her transfer letter, and a written warning to sign, in an apaprent attempt

10

to close her file. This was just a few days after Hattle found out that Finnigan sexually assaulted another female employee twice at work.

91. On September 25, 2021, Plaintiff responded with the documents signed but wrote on both: "My signature is to acknowledge receipt of this document. I disagree with the contents of this document."

92. On September 28, 2021 – just a month after being transferred – Plaintiff went into work and was greeted by the General Manager, Brandon Rogers, and Hattle.

93. Hattle told Plaintiff that MJR was ending her employment

94. Plaintiff asked Hattle about the policy about not signing documents. She told Plaintiff that she would send it to her.

95. Plaintiff's company email was deactivated less than 24 hours after this, and she never received any emails from Hattle.

96. Upon information and belief, Plaintiff did not violate any company policy.

97. Plaintiff believes she was sexually harassed and wrongfully terminated in retaliation for reporting the same, in violation of state and federal law.

## EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

98. Ms. Wargo exhausted her administrative remedies and satisfied this jurisdictional prerequisite.

99. Ms. Wargo filed a Charge of Discrimination with the Equal Employment Opportunity Commission regarding Defendant's discriminatory conduct.

100. The Equal Employment Opportunity Commission issued a Notice of to Sue letter on June 2, 2022. This lawsuit followed.

11

## COUNT I

## GENDER/SEXUAL HARRASMENT/DISCRIMINATION IN VIOLATION OF TITLE VII

101.   Plaintiff incorporates by reference all allegations in the preceding paragraphs.

102.   At all material times, Defendant was an employer covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended.

103.   Defendant's conduct, as alleged herein, violated Title VII, which makes it unlawful to sexually harass an employee or discriminate against said employee on the basis of gender.

104.   A respondeat superior relationship existed because Plaintiff's supervisors, had the ability to undertake or recommend tangible decisions affecting Plaintiff or the authority to direct Plaintiff's daily work activity as alleged in the statement of facts.

105.   Plaintiff is a woman and a member of a protected class.

106.   Plaintiff was subjected to communication or conduct on the basis of her gender, as indicated in the facts above.

107.   Finnigan is a male who sexually harassed Plaintiff.

108.   The communication and conduct from Finnigan was unwelcomed.

109.   The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Plaintiff's employment or created an intimidating, hostile, or offensive work environment as alleged in the statement of facts.

110.   Plaintiff notified Defendant and/or Defendant's agents of the unwelcomed conduct and communication and Defendant failed to remedy the unwelcomed conduct or communication.

111. Defendant believed Finnigan, a male, over Plaintiff, a female, despite clear evidence of Finnigan's abusive behavior toward her and other women.

112. As a direct and proximate result of Defendant's and Defendant's agent's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, emotional distress, humiliation and embarrassment, loss of professional reputation, and was terminated.

113. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT II

### GENDER/SEXUAL HARRASMENT/DISCRIMINATION IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 et seq. ("ELCRA")

114. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

115. At all material times, Defendant was an employer covered by, and within the meaning of the Elliott-Larsen Civil Rights Act ("ELCRA"), as amended.

116. Defendant's conduct, as alleged herein, violated ELCRA, which makes it unlawful to sexually harass or discriminate against an employee.

117. A respondeat superior relationship existed because Plaintiff's supervisors, had the ability to undertake or recommend tangible decisions affecting Plaintiff or the authority to direct Plaintiff's daily work activity as alleged in the statement of facts.

118. Plaintiff is a woman and a member of a protected class.

119. Plaintiff was subjected to communication or conduct on the basis of her gender, as indicated in the facts above.

120. Finnigan is a male who sexually harassed Plaintiff.

121. The communication and conduct from Finnigan was unwelcomed.

122. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Plaintiff's employment or created an intimidating, hostile, or offensive work environment as alleged in the statement of facts.

123. Plaintiff notified Defendant and/or Defendant's agents of the unwelcomed conduct and communication and Defendant failed to remedy the unwelcomed conduct or communication.

124. Defendant believed Finnigan, a male, over Plaintiff, a female, despite clear evidence of Finnigan's abusive behavior toward her and other women.

125. As a direct and proximate result of Defendant's and Defendant's agent's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, emotional distress, humiliation and embarrassment, loss of professional reputation, and was terminated.

126. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT III

**RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e** *et seq*. **("Title VII")**

127. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

128. At all material times, Defendant was an employer and Plaintiff an employee, covered by, and within the meaning of Title VII.

129. Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to retaliate against an employee for engaging in protected activity.

130. A respondeat superior relationship existed because Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct Plaintiff's daily work activity, as alleged in the statement of facts.

131. Plaintiff engaged in protected activity when she took the following actions, including but not limited to, reporting to Defendant sexual harassment by her supervisor.

132. Defendant, through its employees, had knowledge that Plaintiff engaged in protected behavior, because, among other things, several of them witnessed the conduct and were the individuals to whom Plaintiff reported the harassment and discrimination.

133. Defendant and/or its agents took adverse employment actions against Plaintiff, including but not limited to requiring her to return to work despite the mistreatment she was continually experiencing, transferring her, and eventually terminating her.

134. But for Plaintiff's participation in protected activity, Defendant would not have taken said adverse employment actions against Plaintiff.

135. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

136. Plaintiff notified Defendant and its agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

137. As a proximate result of Defendant's retaliatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

138. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

139. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT IV

### RETALIATION IN VIOLATION OF THE ELCRA

140. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

141. At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of, the ELCRA.

142. Defendant's conduct, as alleged herein, violated the ELCRA, which makes it unlawful to retaliate against an employee who has engaged in protected activity.

143. A respondeat superior relationship existed because Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and/or the authority to direct Plaintiff's daily work activity, as alleged throughout this complaint.

144. Plaintiff engaged in protected activity when he took the following actions including but not limited to reporting to Defendant sexual harassment by her supervisor.

145. Defendant, through its employees, had knowledge that Plaintiff engaged in protected behavior, because, among other things, several of them witnessed the conduct and were the individuals to whom Plaintiff reported the harassment and discrimination.

146. After Plaintiff engaged in protected activity, Defendant's agents thereafter harassed Plaintiff and took several adverse employment actions against culminating in Plaintiff's termination.

147. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiffs rights.

148. Plaintiff notified Defendant's agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

16

149. As a proximate result of the Defendants' discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

150. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

151. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT V

### HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF THE ELCRA

152. Plaintiff incorporates by reference all allegations in the proceeding paragraphs.

153. At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of the ELCRA.

154. A respondeat superior relationship existed because Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and/or the authority to direct Plaintiff's daily work activity, as alleged throughout this complaint.

155. Defendant's conduct, as alleged herein, violated the ELCRA, which makes it unlawful to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

156. Defendant intentionally created an environment, more fully laid out in the statement of facts and herein the complaint, in which Plaintiff was subjected to harassment.

157. Defendant knew specifically of Plaintiffs mistreatment because she made a complaint.

158. This type of conduct was intended to, and did interfere with Plaintiffs employment, and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

159. Defendant's hostile work environment was culminated intentionally, with malice, or with reckless indifference to Plaintiffs rights.

160. But for Defendant's illegal discrimination and retaliation, and the environment that that discrimination and retaliation created, Plaintiff would not have been damaged nor terminated.

161. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

162. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

163. Plaintiff requests relief as described in the Prayer for Relief below.

## **RELIEF REQUESTED**

PLAINTIFF Terra Wargo respectfully requests that this Honorable Court enter judgment against Defendant as follows:

1. Compensatory damages in whatever amount to which Plaintiff is entitled;
2. Exemplary and/or punitive damages in whatever amount which Plaintiff is entitled;
3. An award of lost wages and the value of fringe benefits;
4. An award of interest, costs, and reasonable attorney fees; and
5. An order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Dated:  August 31, 2022	Respectfully Submitted,

/s/ Carla D. Aikens
Carla D. Aikens (P69530)
Rejanaé M. Brooks (P85701)
CARLA D. AIKENS, P.L.C.
*Attorneys for Plaintiff*
615 Griswold Ste. 709
Detroit, MI 48226
carla@aikenslawfirm.com
rejanae@aikenslawfirm.com