UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRA WARGO,                                          Case No. 22-12063

     Plaintiff,                                      F. Kay Behm
v.                                                    United States District Judge

MJR PARTRIDGE CREEK DIGITAL
CINEMA 14,

     Defendant.
_____ /

**OPINION AND ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT (ECF No. 39)**

## I.    PROCEDURAL HISTORY

Plaintiff, Terra Wargo, brought a complaint against her former employer,

MJR Partridge Creek Digital Cinema 14 (MJR) asserting claims of hostile work

environment, gender discrimination, and retaliation under Title VII and the Elliott-

Larsen Civil Rights Act (ELCRA).  (ECF No. 1).  Currently before the court is MJR's

motion for summary judgment on all claims.  (ECF No. 39).  This matter is fully

briefed, and the court held a hearing on February 7, 2024.  (ECF No. 45).

For the reasons set forth below, MJR's motion for summary judgment is

**GRANTED**.

1

## II.     FACTUAL BACKGROUND

Wargo began working for MJR on November 29, 2015, in the Partridge

Creek location in the concessions department and as an usher, when she was 17

years old.  (ECF No. 39-2, pp. 13-14).  Wargo was promoted to Supervisor in the

Summer of 2016 and Assistant Manager in April of 2017.  She was then promoted

to a salaried, full-time manager in January of 2019 and held that position until the

time of termination.  (ECF No. 39-2, p. 14).  In early 2021, Wargo applied and

interviewed for the position of Partridge Creek General Manager.  She did not

receive the position and instead, Paul Finnigan, the General Manager at MJR's

Chesterfield location was given the position.  (ECF No. 39-2, p. 18).  At that time,

Wargo was offered the opportunity to move to the Chesterfield location and take

the General Manager position, however, she declined the opportunity for

promotion and elected to remain at Partridge Creek.  (ECF No. 39-2, p. 19).

In October of 2019, MJR theaters were purchased by Kinepolis Group based

in Belgium.  (ECF No. 39-3, p. 9).  Finnigan first began working at the Partridge

Creek location in March of 2021 as General Manager.  (ECF No. 39-2, p. 20).  As

part of his transfer to Partridge Creek, Finnigan was tasked with implementing

new procedures adopted by the new owner.  (ECF No. 39-5, p. 16).

Before Wargo met Finnigan, she told co-worker Hannah Vennard, via text on April 2, 2021, that "I need to see how he interacts with me in person before I'm a bitch to him. LOL. Respect is earned, not demanded."  (ECF No. 39-2, p. 69). She further stated via text message to Vennard on that same date, "I feel like he's been in a rut at Chesterfield and wants to reinvent himself here since no one knows him. If its really bad I will be confronting him and talking to Joel" and "I'm ready for the worst because we are already off to a bad start."  (ECF No. 39-2, p. 70).  Wargo complained to Matthew Schwartz (the GM that Finnegan was replacing) about Finnigan the week he arrived because she felt he was not speaking to the employees and other employees were expressing concerns to her about that.  (ECF No. 39-2, pp. 21-22).  Schwartz reported Wargo's concerns to Joel Kincaid, Vice-President of Operations.  (ECF 39-4, pp. 6-7).

On April 20, 2021, Wargo texted Vennard asking whether Finnigan had given her some information regarding work.  When Vennard indicated that he had not, Plaintiff replied "Damn it. Ron's not answering. I don't want to ask him," referring to Finnigan.  (ECF No. 39-2, p. 72).  When asked why she didn't want to ask Finnigan, she testified "I just didn't feel comfortable with him." (ECF No. 39-2, p. 72).  Soon thereafter, Wargo set up a meeting with Joshua Jenson, the Director of In-Theater Sales, purportedly to discuss certain operational and reporting

changes, but according to Kincaid, Jenson told him that the real purpose of the meeting was to complain about Finnigan and he reported it to Kincaid also.  (ECF No. 39-2, p. 38; ECF No. 39-4, p. 7).  Wargo says she met with Jenson to talk about the struggles she was having with her new ITS position and Finnigan was part of the problem.  (ECF No. 39-2, p. 39).  In response, Kincaid approached Finnigan and spoke to him about his management style and how to handle the transition to the new team and new building.  (ECF No. 39-4, p. 7).  Wargo admitted that she did not complain to either Schwartz or Jenson about any perceived sexual harassment but rather, only about Finnigan's management style.  (ECF No. 39-2, pp. 38-39).

On April 12, 2021, Finnigan invited Wargo to meet at Bar Louie, a restaurant near the MJR theater at Partridge Creek, via text message.  (ECF No. 39-2, p. 23; ECF No. 39-6[1]).  According to Wargo, the invitation was perceived by her to be harassing because while she had a social and friendly relationship with other GMs, she did not "have any relationship" with Finnigan and "he was still sending me these text messages and inviting me to the bar."  (ECF No. 39-2, pp. 49-50).  Wargo texted Vennard on May 2, 2021 that "I still want to talk to Joel [Kincaid] but unless he's going to get rid of Paul is there even a point."  (ECF No.

---

[1] Wargo testified that the text messages she provided as reflected in ECF No. 39-6 are the only ones she bases her claims of "text-based" harassment on.  (ECF No. 39-2, p. 39).

39-2, p. 72).  On May 24, 2021, Finnigan asked Wargo if she did anything on Monday nights and if she wanted to get something to eat; Wargo declined and the pair proceeded to text about their dogs.  (ECF No. 39-6).

Three months after the first invitation to the bar, on July 13, 2021, Finnigan asked Wargo to again meet him at Bar Louie via text message.  (ECF No. 39-6).  Wargo declined to meet Finnigan at Bar Louie and remained at MJR, indicating she was busy working.  When Finnigan came into MJR to speak with Wargo there, she indicated that she did not see his text message.  When she did meet in his office, Finnigan asked Wargo what her problem was with him.  (ECF No. 39-2, p. 31; ECF No. 39-6).  Wargo testified that she told him she felt he was lacking respect and communication with the employees.  (ECF No. 39-2, p. 32).  Wargo testified that Finnigan slammed down a piece of paper he was holding and she got up to leave the meeting, telling him the meeting was not productive.  (ECF No. 39-2, p. 32).  Wargo went to the office next door and was followed by Finnigan.  According to Wargo, the argument continued, and she attempted to leave but Finnigan was standing in front of the door.  She reached behind him and grabbed the door handle, pulling it into his back and opened the door and left the building.  (ECF No. 39-2, p. 33).  Wargo also testified that she attempted multiple times to leave and Finnigan prevented her from doing do by using his body to block the

door.  (ECF No. 39-2, p. 34).  Wargo also claims that Finnigan touched her

inappropriately during this meeting as he had his hand on her arm for five to 10

seconds to prevent her from leaving.  (ECF No. 39-2, p. 28).

The following day, July 14, 2021, Wargo reached out to Kincaid, asking for a

meeting to report her concerns.  (ECF No. 39-2, p. 37; ECF No. 39-7).  Wargo met

with Kincaid and Melissa Hattle, Human Resources Manager for MJR, on July 15,

2021, to discuss her concerns about Finnigan and the July 13th incident in

particular.  (ECF No. 39-2, p. 39).  In advance of the meeting, Wargo emailed

Kincaid a memo prepared by her along with Vennard detailing their concerns

about Finnigan, including both his management style and her concerns about any

sexually harassing or sexually discriminatory conduct.  (ECF No. 39-2, p. 41; ECF

No. 39-8; ECF No. 39-9).  In the email, Wargo mentioned the incident where

Finnigan passed her driving in the Partridge Creek parking lot, she parked her car

by the bar where she was meeting a friend, and she saw Finnigan turn around,

drive by the bar and he texted her about seeing her at that bar.  (ECF No. 39-8).  In

her memo, she mentions the uncomfortable text messages.  (ECF No. 39-9).  After

the meeting, Wargo provided a written statement to Hattle detailing her

complaints.  In her report, she indicated that she felt she could not work in the

same building as Finnigan and wanted him fired.  (ECF No. 39-2, p. 54; ECF No. 39-

10; ECF No. 39-11[2]).  Wargo testified that no verbal sexual harassment transpired outside of the text messages, but also testified that there were two instances of verbal sexual discrimination by Finnigan, neither of which she actually heard but that were told to her by others.  (ECF No. 39-2, pp. 26, 27, 28).

Following MJR's investigation, which included viewing the videos of the incident, Kincaid and Hattle determined that while there was no conduct which would qualify as "illegal, sexual harassment or other harassment, discrimination or threat of physical violence," both Wargo and Finnigan had engaged in performance related misconduct and both received written warnings.  Finnigan was also placed on a Performance Improvement Plan.  (ECF No. 39-5, pp. 40-41; ECF Nos. 39-12, 39-13, 39-14).  MJR determined that Wargo repeatedly refused to meet with Finnigan despite specific requests to do so, consistent with her admissions.  (ECF No. 39-3, p. 17).  In addition, both Wargo and Finnigan admitted to yelling during the meeting and Wargo was found to be not appropriately reporting personnel concerns and discussing them with her peers.  (ECF No. 39-3, p. 18).  Nevertheless, due to her concerns about working with Finnigan, Wargo

---

[2] There is apparently another version of this report, which appears to be altered.  (ECF No. 43-2).  When asked about this discrepancy, MJR's corporate representative could not answer why it had occurred.  (ECF No. 39-3, p. 28).  The parties appear to agree that the complaint form found at ECF No. 39-11 is the correct form, although the version submitted to the court cuts off most of the information submitted by Wargo.  *Id*.

was offered and accepted the opportunity to transfer to a different MJR theater –

MJR Marketplace – in the same position, with the same pay.  (ECF No. 39-2, p.

59).

On September 15, 2021, although she was no longer assigned to MJR

Partridge Creek, Wargo went to the theater, according to her, to meet with

Vennard to assist her with some work-related tasks in the cash office.  (ECF No.

39-2, pp. 73-74).  Wargo admitted that she no longer had any work

responsibilities at Partridge Creek at this time.  (ECF No. 39-2, p. 74).  While

Wargo initially claimed she was in the office for less than an hour, she later

admitted that it could have been as long as three hours.  (ECF No. 39-2, p. 75).

Wargo admitted that while in the Partridge Creek office for "possibly" up to

three hours, contrary to directive given to her verbally and in writing on several

occasions, she discussed personnel matters with Vennard and another employee

who was in the office.  In addition, she discussed personnel matters via text with

the other employee. (ECF No. 36-2, p. 76, p. 79).  The other employee - Jocelyn

Rizo-Llamas - quit the day after meeting with Wargo at Partridge Creek, after

submitting a complaint claiming that Finnigan had "grabbed her butt."  (ECF No.

39-2, pp. 76-77).  According to Wargo, she was "possibly" assisting Vennard in

preparing a complaint form for Rizo-Llamas during the three-hour meeting at

Partridge Creek.  Wargo testified that she did not report the complaint herself to MJR's HR department because Vennard was already doing so.  (ECF No. 39-2, pp. 77-78).  MJR contends that Vennard had already submitted an email to HR on August 29, 2021 reporting employee concerns regarding Finnigan, well before Wargo's meeting in the cash office on September 15, 2021.  (ECF No. 39-17; ECF No. 39-5, pp. 11-12).  Wargo suggests that it is not clear from that email that the Rizo-Llamas complaint was necessarily included in the scope of that email or whether there was some other email sent by Vennard, however Wargo does not point to any other emails from Vennard in the record.  Hattle had already initiated her investigation by attempting to review relevant video footage, although "there did not appear to be camera view of the specific location."  (ECF No. 39-5 p. 15). Hattle was unable to interview Rizo-Llamas because she quit soon thereafter. (ECF No. 39-5, p. 14).

On September 16, 2021, Finnigan arrived at MJR Partridge Creek and found that his nameplate had been removed from his office door and was on the floor. In the course of attempting to determine what happened, he reviewed video footage and discovered that Plaintiff had been in the Partridge Creek cash office for approximately three hours the day prior with Vennard and Rizo-Llamas.  (ECF No. 39-17).  However, he did not identify the person who removed the name

plate.  (ECF No. 43-1, p. 55).  On September 22, 2021, he submitted a complaint to MJR's HR department complaining about Plaintiff's involvement in the previously filed complaint from Rizo-Llamas.  (ECF No. 39-17).

On September 27, 2021, Wargo was terminated by MJR for not following company policy.  (ECF No. 39-18).  Wargo maintains that she was terminated for speaking out against Finnigan, who was a longtime colleague of Kincaid.  Hattle testified that Wargo was terminated because she was discussing confidential matters with peers and not reporting the allegations to the HR department, despite being advised of the proper reporting procedure and the importance of maintaining confidentiality of complaints.  (ECF No. 39-5, pp. 31-32).  Wargo maintains that she was only advised of this reporting policy on one occasion and points out that Kincaid did not know what the policy was.  (ECF No. 39-3, p. 25). Kincaid testified that Wargo was terminated because she had been told not to discuss HR related issues with peers and continued to do so.  Further, her three-hour visit to the cash office at Partridge Creek was contrary to the security of that office. Kincaid testified that "[w]e had lost faith that she was trustworthy."  (ECF No. 39-3, pp. 23-24). Wargo disputes Kincaid's characterization of the reasons for her dismissal and notes that the Notice of Dismissal refers to three incidents as

the reasons for Wargo's termination, the majority of which she says relate to

incidents involving Finnigan:

> • 07/08/2021: Inappropriate comments made about GM
> in presence of another MJR Director
> • 07/14/2021: Insubordination, disrespectful comments,
> and verbal outburst directed at supervisor
> • 9/15/2021: Refusal to follow company policy and
> directive provided in corrective/disciplinary action

(ECF No. 39-18).

At the time of her hire, Wargo signed MJR's Non-Retaliation and Complaint

Procedure, which directs employees to immediately report incidents they believe

are harassing or discriminatory to their General Manager or, if the complaint

relates to the General Manager, report to corporate headquarters.  (ECF No. 39-2,

p. 13; ECF No. 39-19).  Kincaid testified that the policy requires employees to

report incidents to HR.  (ECF No. 39-3, p. 25).  Wargo further points out, however,

that Kincaid could not identify any written policy that expressly prohibits

someone from talking to coworkers about their potential HR complaints.  (ECF No.

39-3, p. 25).  Wargo was advised, however, in an email from Hattle on July 15,

2021 that with regard to complaints of harassment and/or discrimination, "the

most strict confidentiality is expected and required during any type of

investigation.  Breach of this confidentiality is a terminable offense."  (ECF No. 39-2, pp. 50-51; ECF No. 39-20).

Wargo initially testified that she had no discussions with anyone regarding complaints about Finnigan after July 15th outside of the context of MJR's investigation.  (ECF No. 39-2, p. 51).  However, she also admitted that she discussed Rizo-Llamas's complaints about Finnigan with Rizo-Llamas before she quit MJR, "possibly" during the three-hour session at Partridge Creek, and further sent a text message to Rizo-Llamas on September 21, 2021 stating that "It makes me sick the lengths they will go to cover up for this man."  (ECF No. 39-2, pp.77, 79).

In addition to her belief that Finnigan engaged in sexually harassing and/or discriminatory conduct toward her, Wargo testified that Kincaid and Hattle also engaged in sexually harassing and/or discriminatory conduct toward her.  (ECF No. 39-2, p. 29).  As to Kincaid, Wargo believes that because Kincaid 1) sided with Finnigan before hearing anything she had to say, and 2) told her that he was not going to fire Finnigan and that he would have fired her if he was in Finnigan's position, he engaged in discriminatory or harassing conduct.  (ECF No. 39-2, p. 29).  As to Hattle, Wargo says that the sexually harassing or discriminatory conduct was that: 1) she justified many of Finnigan's actions, 2) she said since

Wargo left the building before her scheduled shift she could be terminated (which Wargo claimed was not true), 3) she stated she was doing her own investigation without Kincaid (which Wargo claimed is not true because Kincaid was involved in all aspects), and 4) she was siding with Kincaid since that is her boss.  (ECF No. 39-2, p. 30).  Wargo testified that no one at MJR outside of Finnigan, Kincaid and Hattle did anything that she believes constitutes sexual harassment or discrimination.  (ECF No. 39-2, p. 30-31).  On February 9, 2022, Wargo filed a Charge of Discrimination with the Michigan Department of Civil Rights, claiming that her General Manager "followed me after work" and was "asking her out on dates."  (ECF No. 39-21).

**III.   ANALYSIS**

A.   <u>Standard of Review</u>

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

support the fact."  Fed. R. Civ. P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'"  *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).

To fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477 U.S.

at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and

defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

B.    Hostile Work Environment (ELCRA and Title VII)

Under the hostile work environment theory, in order to survive summary judgment, Wargo must establish that: (1) she is a member of a protected class; (2) she was subjected to harassment, either through words or actions, based on sex; (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile or offensive work environment; and (4) there exists some basis for liability on the part of the employer. *Grace v. Uscar*, 521 F.3d 655, 678 (6th Cir. 2008) (citing *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996)). "The standards under Michigan's Elliott-Larsen Act are similar, except that an employer may be held liable for the creation of a hostile work environment only if it 'failed to take prompt and adequate remedial action after having been reasonably put on notice of the harassment.'" *Garner v. Gerber Collision & Glass*, 2017 WL 3642192, at *4 (E.D. Mich. Aug. 24, 2017) (quoting *Mathews v. Massage Green LLC*, 2016 WL 1242354, at *6 n. 4 (E.D. Mich. Mar. 30, 2016)) (quoting *Chambers v. Trettco, Inc.*, 463 Mich. 297 (2000)). Moreover, "[t]he harassment must meet both an objective and a subjective test, 'in other words, the conduct must be so severe or pervasive as to

constitute a hostile or abusive working environment both to a reasonable person and the actual victim.'"  *Id*. (quoting *Randolph v. Ohio Dep't of Youth Svcs.*, 453 F.3d 724, 733 (6th Cir. 2006)).

To determine whether a hostile work environment exists, a court must consider the totality of the circumstances rather than examining specific incidents or classes of incidents in isolation.  *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999).  Factors to consider in determining whether a hostile work environment exists include, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (emphasis omitted)).  In addition, "courts must determine whether the 'workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'"  *Grace*, 521 F.3d at 678-79 (quoting *Harris*, at 21 (internal citations omitted)).  Failure to establish a *prima facie* case is grounds to grant a defendant summary judgment.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).  Once a hostile work environment is established, an employee alleging sexual harassment by a coworker must still establish that the

employer is liable because it knew or should have known of the harassment yet failed to take prompt and appropriate corrective action.  *EEOC v. Harbert-Yeargin, Inc.,* 266 F.3d 498, 518 (6th Cir. 2001).  To establish the existence of a hostile work environment a plaintiff must meet both a subjective and objective standard.  *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir.2000) ("The conduct must be severe and pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive.").

MJR argues that even accepting Wargo's claims regarding Finnigan's conduct as truthful, her hostile work environment claim fails because the conduct was neither severe nor pervasive.  MJR also argues that Wargo's claim fails because it investigated and took remedial action.  Wargo responds by repeating all the facts that support her hostile work environment claim but does not fully respond to MJR's arguments regarding the legal deficiencies of the claim.  She also argues that MJR cannot rely on the investigation because it was tainted.

Wargo's hostile environment claim is based on: (1) Finnigan's attempts to take Wargo to a bar, despite her repeatedly declining; (2) making Wargo feel uncomfortable with Finnigan's text statements such as "I will teach you all I know;" "I have a lot to show and teach...You'll see, I promise;" "I can show you

everything… If you let me;" "I will teach you everything. You just have to trust me,
and my methods. You will learn more than you think;" and "I wanted to treat you
to dinner…" (ECF No. 39-6); (3) another employee told Wargo that Finnigan said
she would be "trouble" (ECF No. 39-2, p. 27); (4) the incident where Finnigan
raised his voice, slammed a piece of paper on his desk, placed his hand on her,
and blocked her from leaving his office (ECF No. 39-2, pp. 28, 31-34, 41); and (5)
what Wargo described as a "stalking like" incident where Finnigan passed her
driving in the Partridge Creek parking lot, she parked her car by the bar where she
was meeting a friend, and she saw Finnigan turn around, drive by the bar and he
texted her about seeing her at that bar (ECF No. 39-2, p. 102).

In the court's view, the alleged harassment outlined by Wargo was not
sufficiently severe or pervasive.  "While there is no magic number of incidents
that must occur within a certain period, when comparing the conduct about
which [Plaintiff] complains to the conduct alleged in cases within this Circuit
where a hostile work environment was found to exist, [Plaintiff's] claim does not
favorably compare."  *Hunter v. Gen. Motors LLC*, 2019 WL 1436847, at *10 (E.D.
Mich. Mar. 31, 2019), aff'd, 807 F. App'x 540 (6th Cir. 2020) (citing *Clay v. United
Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) (The Sixth Circuit concluded
that 15 incidents over a two-year period was not sufficiently pervasive.).  While

Wargo identified a number of incidents, they occurred sporadically and thus are

not pervasive.[3]  As to the text messages regarding meeting socially on a handful of

occasions over several months, these requests were not so frequent as to be

harassing.  One of the requests appears to have been an attempt to schedule a

meeting with Wargo.  (ECF No. 39-6).  In addition, the severity of the incidents

was slight.  While one of the incidents included a physical component, it was in

the context of Wargo and Finnigan admittedly yelling at each other and neither

party behaved professionally.  Moreover, the text messages regarding teaching

and training Wargo do not appear to be gender-based harassment and appear to

be part of discussions about Wargo learning her new job duties.  While some of

---

[3] Ample Sixth Circuit authority negates the existence of a hostile work environment here.  *See Graves v. Dayton Gastroenterology*, 657 F. App'x 485, 489-90 (6th Cir. Sept. 13, 2016) (comparing *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008) (finding a genuine dispute of fact as to the existence of a hostile work environment where the plaintiff's supervisor was preoccupied with sex talk and made unwelcome, persistent, and increasingly intimidating advances); *Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 334-35 (6th Cir. 2008) (finding a genuine dispute of fact where the harasser repeatedly made "graphic, personal, and sexually explicit" comments and regularly touched multiple women); *Randolph v. Ohio Dept. of Youth Servs.*, 453 F.3d 724, 734–36 (6th Cir. 2006) (finding a genuine dispute of fact where the plaintiff "was subject to daily threats, derogatory comments, verbal harassment, foul language, and several serious physical assaults to which members of the opposite sex were not exposed."); with *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351–52 (6th Cir. 2005) (comparing cases and finding no hostile work environment where the plaintiff alleged isolated incidents of her supervisor telling vulgar jokes, twice placing his vibrating pager on her thigh, and pulling on her overalls after asking what type of underwear she was wearing); and *Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 459-60 (6th Cir. 2004) (finding no hostile work environment where the plaintiff's co-worker continuously commented on women's physical appearances and spoke at the shift meetings about sleeping with different women)).

these incidents may have been bothersome, even in their totality, they are not so severe and pervasive that they should interfere with an employee's work performance.

Moreover, the Sixth Circuit distinguishes between harassment and *discriminatory* harassment. *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000)); *see also Graves v. Dayton Gastroenterology, Inc.*, 657 F. App'x 485, 489 (6th Cir. 2016) (To be actionable, the harassment must establish that members of one sex are exposed to disadvantageous terms or conditions of employment to which the members of the other sex are not exposed. "This typically includes explicit or implicit proposals of sexual activity, as well as non-sexual conduct that evinces anti-female animus.") (citations and internal quotation marks omitted)). An employee must demonstrate that the allegedly harassing conduct was motivated by a bias towards the employee's protected class, here, gender. *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)). And Wargo's belief that these incidents of purported harassment were because of her gender does not create an issue of fact. While it may satisfy the subjective prong of the hostile work environment test, it does not create a material issue of fact because she must also satisfy the objective prong of that test, which requires an

environment sufficiently severe or pervasive to create the type of environment that a reasonable person would find it to be hostile or abusive.  Wargo does not offer evidence suggesting that the purportedly harassing conduct was motivated by her gender.  In the court's view, Wargo has not proffered sufficient evidence from which a jury could reasonably conclude that she was subjected to a severe or pervasive hostile work environment based on her *gender*.  Accordingly, summary judgment in favor of MJR on Wargo's hostile work environment claims is warranted.[4]

C.    Discrimination (Title VII and ELCRA)

Wargo alleges that she was discriminated against and discharged based on her gender in violation of Title VII and Elliott-Larsen.  The Sixth Circuit reviews claims of discrimination brought under the ELCRA under the same standards as claims brought under Title VII.  *Ladenberger v. Plymouth-Canton Cmty. Sch.*, 2018 WL 3914709, at *5 (E.D. Mich. Aug. 16, 2018) (citing *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 499 (6th Cir. 2011)).  "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Schering–Plough*

---

[4] Because the court concludes that Wargo has not established a prima facie case, it need not address MJR's arguments regarding the investigation and remedial action.

*Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).  Absent direct

evidence of discrimination, a plaintiff may rely on circumstantial evidence to

establish a case of gender discrimination under the familiar burden-shifting

framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  To establish

a *prima facie* case for Title VII gender discrimination under that framework,

Plaintiff must show that: (1) she belongs to a protected class, (2) she suffered an

adverse employment action, (3) she was qualified for the position, and (4) that

the job was given to a person outside the protected class or that she was treated

differently than a similarly situated, non-protected employee.  *Abdulnour v.*

*Campbell Soup Supply Co.,* 502 F.3d 496, 501-02 (6th Cir. 2007); *Lyons v.*

*Metropolitan Gov't of Nashville & Davidson Cnty.*, 416 F. App'x 483 (6th Cir. 2011).

If a plaintiff establishes a *prima facie* case, the defendant can rebut it by

articulating a legitimate non-discriminatory reason for its action.  *Id.*  Thereafter, a

plaintiff has the burden of showing, by a preponderance of the evidence, that the

legitimate asserted reason was not the actual reason for the defendant's actions,

but in fact was pretext for gender discrimination.  *Chen v. Dow Chem. Co.*, 580

F.3d 394, 400 (6th Cir. 2009).  A plaintiff may establish that the defendant's

proffered reason is mere pretext by establishing that it: (1) has no basis in fact; (2)

did not actually motivate plaintiff's termination; or (3) was insufficient to warrant

plaintiff's termination.  *Abdulnour*, 502 F.3d at 502 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

MJR first argues that Wargo has no direct evidence of discrimination, focusing on the text messages between Finnigan and Wargo.  Wargo's response does not address whether this evidence, or any other evidence, constitutes direct evidence of discrimination.  "Direct evidence is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor."  *Kostic v. United Parcel Serv., Inc.*, 532 F. Supp. 3d 513, 527 (M.D. Tenn. 2021); *see also Umani v. Michigan Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011).  Direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.  *Id.*; *see also Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).  Importantly, the evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of gender, but also that the employer acted on that predisposition.  *Id.* (citing *Lovell v. Champion Car Wash, LLC*, 969 F. Supp. 2d 945, 951 (M.D. Tenn. 2013) (direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least

in part by prejudice against members of the protected group)). None of the evidence marshaled by Wargo falls into the category of direct evidence. Accordingly, she cannot establish gender discrimination in this manner.

MJR also challenges Wargo's discrimination claim based on circumstantial evidence under the *McDonnell Douglas* burden-shifting paradigm. MJR challenges only two elements of the prima facie case – that Wargo was subject to an adverse employment action and that she was treated less favorably than a similarly situated employee. Under Sixth Circuit law, to establish that she was treated differently than similarly situated employees, Wargo must show that she and her proposed comparators were similar in all relevant respects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998). In every case, the court must make an "independent determination" of what factors are relevant, and that determination depends on whether certain factors "are meaningful to the particular claim of discrimination presented." *Rembert v. Swagelok Co.*, 2023 WL 3094546, at *7 (6th Cir. Apr. 26, 2023) (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012), abrogated on other grounds by *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)); *see also Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (explaining the necessity of independently determining factors relevant to this inquiry). Ordinarily, "to be

deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to

compare his/her treatment must have dealt with the same supervisor, have been

subject to the same standards and have engaged in the same conduct without

such differentiating or mitigating circumstances that would distinguish their

conduct or the employer's treatment of them for it."  *Jordan v. Mathews Nissan,*

*Inc.*, 539 F. Supp. 3d 848, 873 (M.D. Tenn. 2021) (quoting *Mitchell v. Toledo Hosp.*,

964 F.2d 577, 583 (6th Cir. 1992)).  At best, Wargo argues in her response that she

was treated differently from Finnigan:

> Defendant's notice of dismissal states the incidents
> involving Paul Finnigan formed the majority of the listed
> reasons for her dismissal. (Defendant's Exhibit Q).
> Defendant's notice also lists the incident with Paul
> Finnigan as a reason for dismissal. This leads to another
> question if Ms. Wargo's actions were enough to
> been terminated almost immediately after being
> transferred, why was Paul Finnigan only placed on a PIP
> when multiple complaints had been received about
> his inappropriate behavior. (See Defendant's Exhibit P).

(ECF No. 42, PageID.511).  However, Wargo offers no analysis or evidence

suggesting that she and Finnigan are proper comparators.  Wargo must show that

Finnigan "engaged in the same conduct without such differentiating or mitigating

circumstances that would distinguish their conduct or the employer's treatment

of them for it."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).  For

the plaintiff to meet her burden, she must do more than make "generalized and vague allegations" that another employee was treated better than her.  *Stewart v. Esper*, 815 F. App'x 8, 17 (6th Cir. 2020) (quoting *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 147 (6th Cir. 2007)).  As to the incident where Wargo and Finnigan were both disciplined, he was disciplined more severely given that he was given a written warning and put on a performance improvement plan, while Wargo only received a written warning.  As to the incidents leading to her termination and her termination itself, Wargo does not identify anyone outside her protected class who engaged in similar conduct to her and was neither disciplined nor terminated.  Wargo's failure to identify any comparators is fatal to her prima facie case of gender discrimination.[5]  Accordingly, MJR is entitled to summary judgment on these claims.

> D.   Retaliation

Title VII prohibits an employer from retaliating against an employee "because [s]he has made a charge" of discrimination.  *Charles v. MedTest DX, Inc.*, 2018 WL 3997673, at *5 (E.D. Mich. Aug. 21, 2018) (citing 42 U.S.C. § 2000e-3(a)).  The Elliott-Larsen statute includes a similar provision, *see* Mich. Comp. Laws

---

[5] Given this conclusion, the court need not address Defendant's alternative arguments for summary judgment on these claims.

§ 37.2701(a), which is analyzed under the same standard.  *Charles*, at *5 (citing

*Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 627 (6th Cir. 2013)).  A retaliation claim

can be established "either by introducing direct evidence of retaliation or by

proffering circumstantial evidence that would support an inference of

retaliation."  *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 538 (6th Cir.

2008).  "Direct evidence is that evidence which, if believed, requires no inferences

to conclude that unlawful retaliation was a motivating factor in the employer's

action."  *Id.* at 543-44 (citing *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th

Cir. 2003); *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 879 (6th Cir. 1991)).

Where a plaintiff does not have direct evidence of retaliation and instead relies

only on circumstantial evidence, the *McDonnell Douglas* framework applies.

*Jordan*, 490 F. App'x at 742.  To establish a *prima facie* case of retaliation, Wargo

must establish that: (1) she engaged in a protected activity under Title VII; (2) her

"exercise of such protected activity was known by the defendant; (3) thereafter,

the defendant took an action that was 'materially adverse' to the plaintiff; and (4)

a causal connection existed between the protected activity and the materially

adverse action."  *Rogers v. Henry Ford Health Sys.*, 2018 WL 3629057, at *8 (6th

Cir. July 31, 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir.

2014)).

MJR argues both that Wargo did not engage in protected activity, given the vague nature of her complaints, and that she cannot show her termination was causally connected to her complaints.  In response to MJR's first argument, Wargo identifies all the various complaints that Wargo made.  As to the second argument, Wargo merely refers the court to the arguments she made regarding her other claims.  However, nowhere in her response brief does Wargo address MJR's failure of causation argument.  Accordingly, she has abandoned this claim. *See Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007) (stating that the district court "correctly noted … that [plaintiff] abandoned [certain] claims by failing to raise them in his brief opposing the government's motion to dismiss the complaint"); *PNC Bank, Nat'l Ass'n v. Goyette Mech. Co.*, 88 F. Supp. 3d 775, 785 (E.D. Mich. 2015) ("A plaintiff abandons undefended claims."); *Mekani v. Homecomings Fin., LLC*, 752 F. Supp. 2d 785, 797 (E.D. Mich. 2010) (stating that where a plaintiff fails to respond to an argument in a motion to dismiss, "the Court assumes he concedes this point and abandons the claim").  Wargo has failed to rebut or address MJR's causation argument and therefore, Wargo's retaliation claims are dismissed.

IV.     **CONCLUSION**

For the reasons set forth above, the court **GRANTS** MJR's motion for

summary judgment.

**SO ORDERED**.

Date: February 21, 2024                    <u>s/F. Kay Behm</u>
                                           F. Kay Behm
                                           United States District Judge